This is, my name is Beverly Baker Kelly and I represent Emilia Duarte, a left-behind parent whose children were abducted by the take-away father when they were in Mexico without consent, with, when she was in full, when she had full custody over the children and with witnesses, eyewitnesses to this abduction. I reserve time at the end for a, reserve five minutes for rebuttal and I appreciate your allowing me to address you today. There are three issues that we are concerned with here. One is the district court's abuse of discretion under the Federal Rules of Civil Procedure 59E. Second, the same discretion under 61 and the fault test, which can be applied, the three-part test. Then lastly, we have to look at the policy considerations of 59E and ICARA and it's, these certainly are not, these policy considerations of fairness in the courts are not addressed by, are not satisfied by a judgment against Mr. Duarte. The fourth issue that should be considered is that, that should not be considered is that Scalia Why don't you just jump to these issues? You know, we've gone through all this. Okay. Let me ask you a question, Ms. Baker-Kelley. Pardon me? What I'm principally interested in is the timing of the filing of the petition. As I see from my notes, an action under the Hague Convention, which is what this woman has brought, if it is not filed within one year of the abduction of the children, the rule in the Hague Convention is that the abducting parent can argue, as an affirmative defense to the abduction, that the children are, quote, well settled. That is what happened here. The abduction took place in July of 03. She didn't file until June of 05, more than one year, almost two years. The presumption that they were well settled arose. The judge denied her motion, and on motion to alter or amend, Rule 59, the mother brought forward no evidence which would indicate that the children were not well settled. Why did the judge not rule within his discretion in denying the motion to alter or amend the judgment? Because we had not really gotten to the substantive part of the discussion. I'm not interested in the substantive part. This is a court of appeal. I'm not – some of our courts of appeal retry cases. I'm content with reviewing them. Correct. So we – my question is, what legal error was committed by the trial judge? What – where is the abuse of discretion under the facts as I have related them? If my facts are wrong, I urge you to straighten me out. Okay. First of all, we don't get to the one-year rule before you get to the one-year rule. We get to this procedural issue of he – the judge said, I will hear your case. I will hear your facts. I will hear your facts on tolling. Is this what you're referring to? The district judge said on the record on September 1, 2006, and so if we see proof that Duarte had her purse stolen in Mexico, which I insert, on the 15th, if you get that on the 15th, then I'll put the matter back on the calendar for status, and we'll address any depositions or anything else you want to address. Absolutely. So from the standpoint of the litigants, as I understand it, when you made the 59E motion, and you proved that she lost her purse, or there's enough evidence to indicate that you did the best you could, and he now – the judge now practically admits, yes, there was grounds for reopening, the sole position you have to take is the motion should have been granted, and now we'll go from what the judge said, and we'll have a chance to prove something. Now, the part that bothers me is that there were affidavits and other material in the record, and so I need to ask you this, because this thing's been long, long delayed. Do you have anything – it's over a year. If the merits were before the district judge, do you have matters which would bring forth the estoppel theory? Absolutely. So you think there's reasons why you couldn't do it in one year, why your client couldn't do it? Absolutely. And what would those reasons be? The children were hidden from the mother. The father changed his telephone number. Okay. Well, in other words, you say you've got information. Yes. All right. But they always lived at the same house, did they not? We are not sure. She wasn't sure where they lived. He sent packages to her from three different addresses. She had – she made 24 attempts to find the children, to have other people call, to have other people visit, and she could not find the children. Here we're making the father – remember that the mother left for Mexico in the year 2000 with the children. The mother made sure that the children talked to the father every week from the grandparents' homes. She took them to visit. The father had continual contact with them. Here you have a father on September 15th of 2002 – 2003 that absolutely cuts off any type of communication with – from this mother and her children. Has the mother been able to see or contact the children ever since the abduction? She was able to contact the children for – when she first started in superior court. She saw them for three visits, three or four visits. The father then – the attorney came back, made certain unsubstantiated claims, and the trial court said, this is in the superior court. Well, then let's let the – let's go through – first of all, let's go through – let's withdraw visitation and not allow her to see them right now until we take this slow, as he said it. When we got to the federal district court, which was also our trial court, the judge was going to allow her to see the children when she returned from Mexico for this trial. He then on September 1st withdrew that, and then on – subsequently on a request for visitation, he denied it. So she has not seen her children except for a very short period of time, since 2003 when they were abducted. Is there any chance – I mean, I know this is a part, and I know you have a motion here to send this back to the district court for visitation, but it seems so obvious to me. Can't the lawyers get together on a visitation program? Yes. I've asked Mr. Morday that many times, and he says the father will not allow it. Okay. That's what I wanted to know. You don't – I think in your affidavit you indicated that the appellant spoke to her children in San Diego. Yes. By telephone in July and August of 2003. Correct. At that time they were in San Diego. Yes. They had been abducted. The court, as I said, the superior court, allowed for in-person and telephonic visitation. Right. That was rescinded. But they were in San Diego. They were both in San Diego, yes. And why did she not – She hadn't returned to Mexico because her visa had expired. Why did she not file her Hague Convention action in 2003? She did file her application in 2003. She filed her – she actually filed her Hague application in October of 2003. The Central Authority for Mexico received her application. It was the district attorney. First of all, they had to find Mr. Bardalas. Then second of all, after they found him, the district attorney in San Diego failed to bring the case. She has an affidavit in there saying that we were so busy, we just didn't have time to file this case. So the National Center for Missing and Exploited Children found me and said, would you file this case? And I did. But they didn't find me until 2005. So the district attorney called in something like 2004. The Mexican Central Authority – What you've told me doesn't amount to equitable tolling. No, we're not – we're not talking about – equitable tolling is from the time that she did not know where her children were until the day that we filed her – But that is inconsistent with her talking to them on the telephone in 2003. No, no, no. She only talked – she talked to them for a period of July and August. Right. Of 2003, after they were abducted. So she knew where they were. At that point, he cut off all communication. Tolling is whether or not within that year period. We have subtracted those two months from the time that we filed. We have subtracted those two months that she was in communication with the children. He cut off the communication around September 1st or 15th of 2003. She was not allowed to know where they were. The district attorney's office said, We cannot tell you where the children are because you might go there and kill someone and we might be liable. So, therefore, she did not know until the day we filed the Hague case in the Superior Court where the children were. I took her to Mr. Bardalis' lawyer's office. And he gave us the telephone number and he didn't even give us the address. And he said, You can, because the judge had ordered a visitation. So we are very clear that until the case was filed, she did not know where they were. She called, she made 24 separate attempts to find her children. She called a human rights advocate. Did she know where they are today? Yes, she knows that they're with the father because they're in touch with his lawyer. When she talked to him on the phone, did she ask him, Where are you? It was clear that they were in San Diego. She was calling a San Diego number. Didn't she ask, These are the girls that were supposed to have been molested by her boyfriend? Correct, in 2000. In 2000, yeah. So, when she's talking to the girls, she didn't ask them, Where are you? Of those 24 attempts that she made, the relatives of Hector Bardalis told them that they have left. We don't know where they are. That was what the relatives said. But when she talked to the girls? When she talked to the girls, certainly on the phone. Did she ask the girls, Where are you living? Yes. And what did they tell her? I don't know. We never got a chance to even ask her in court. That's what we should ask her in court. Well, then, should you talk to her? We should ask her in court what they said. What I'm saying is... What do you say in your affidavits? Pardon me? In the response to Judge Fragerson's question, Did the mother determine, when talking to the girls... During those two months that they were in San Diego. In San Diego, living in the house where they had lived before with the father and the mother. True? And the mother. Well, Duarte. Oh, living in the house where they had lived in 2000. Right. Yes. And subsequent to that two years, that two months, when she made inquiries... Whatever happened later... No, no, no. During the tolling period, Your Honor. In July and August of 2003, Counsel, may I finish my question? In August and July 2003, the mother spoke to the daughters in San Diego. They told her they were in San Diego. They told her where they were living in San Diego. They were living with Mr. Bardalis. True? True. After that period, she made 24 attempts to find them. And she was told by relatives, her brother was told. That's what we wanted to bring up at trial. That they have gone. They have left the state. We don't know where they are. That's what she was told. The judge made the assumption that she could have called Mr. Bardalis' work. Mr. Bardalis did not start working there by affidavit from his supervisor until 2002. There was no way for her to have called a work other than the fact, and in addition to the fact, that when you call someone's work, they give you no information about the person. She could have. I mean, she owned half, had a half interest in that house. Right? What could she have done in Mexico? She could have called someone in San Diego and asked them to go buy the house over there. She did. She could have called the police and asked them to go buy the house. She made 24 attempts. Remember, she's in Mexico. She's calling the United States. And she has made 24 separate attempts to find her children. And you're saying, in effect, he's hiding them, and he doesn't want the mother to see the girls. He doesn't want the mother to see any of the four children. I understand that. Yes. Any of the four children. And he has made no attempt. I want to ask one other question off the top of my head. I take it this woman is not a wealthy person of your kind. No, she's indigent. Now, where did it come in the state court and all the federal court that she's supposed to pay child care to the father? Where did that ever come from? It just came out of the blue. Okay. That was started in the state court, though. Yes. Okay. How does that come out of the blue? She has a half interest in this house. They were going to have to sell the family home, supposedly, in order for her to pay this. What the judge didn't factor in was the two years that the mother took care of the children in Mexico with $365 a year total for any kind of gifts or anything that he sent to the children. So that $17,000 would be mitigated by the amount he owes her for those two and a half years that she had the children in Mexico, and he paid nothing. So this was a Superior Court judge in San Diego who ordered her to pay how much money? $17,000. I think it included attorney's fees. And she's supposed to be paying $600 a month for the children. She can't work if she comes here to the United States, and she couldn't pay that amount if she were in Mexico because they just don't earn that amount of money. No, I want to ask you, you know, this is a long time, and the case is in two different courts. It's in the federal courts and it's in the state courts. In the meantime, everybody's delaying. The mother doesn't get to see the children. What and if we send this back, it's going to be more delay. I mean, if we send this back and say you're right, we say the motion should have been granted, and then there will be a hearing on the merits, and I don't know when you'll get to that. By the way, where is the district court? It's in San Diego? San Diego. Okay. What do you want us to do? How could we, in fairness, handle this matter without a lot of delay for the both parties? I do not intend to delay whatsoever. I want visitation for my client, and I simply want to have the court decide on which jurisdiction, Mexico or the United States, will handle this. There is another issue of unfairness that has happened. You want the district court to make that decision. That is the Hague decision. Right. The Hague decision is which court has jurisdiction over these children. And you want them to make that decision without considering whether the children were well settled under the one-year pleading statute. Absolutely not. I want them to first come to the position of whether or not, after they have heard the evidence, whether tolling can be instituted. If tolling is instituted, then the well settled issue would not be. It excludes it. If tolling is not found, they simply look at the well settled, they decide on whether or not the children should stay there or not, and that's the end of the Hague case. They have taken jurisdiction over the case because it is a jurisdictional statute. Well, why not let the matter just go through the state court? It's up in the state court of appeal now. The trial court is the same. First of all, there was a huge error in the state court. That is, he decided, it says specifically in the Hague case, that you are not to decide the issue of custody prior to deciding whether which court has jurisdiction or if you're going to send the children back to Mexico or if you're going to keep them and take jurisdiction here. What that judge did was to off-calendar it and procedurally and properly, something I would argue in the state appeals court, procedurally and properly, and then went on to decide the petition for the establishment of parental, of parentage. That, according to the Hague, is absolutely not forbidden by the judge. So that's what's on appeal there. Now, if you had your choice, which jurisdiction should take this case? Federal court. It's, frankly, it's an aberration to have this case in two courts, and I don't think the Hague Convention really thought that one through. Because so, but I'm asking you from a standpoint, which jurisdiction right now, state or federal, would you prefer that the litigation proceed in? Well, first of all, it isn't in two courts. It is being appealed. That is, the parentage, that's a separate action, is being appealed in the Court of Appeals for California. But that case was withdrawn. I did not. When it was, when he took it off calendar, I took the decision to file in federal court. The federal court took jurisdiction. I would continue this court in, I would continue this case in federal court, and we would be through with it just like that. Well, there's nothing in the state court? Is that what you're saying? Not the Hague case. The Hague case has been. Forget about the Hague case. What remains in the state court? The petition to establish parentage, which cannot under the Hague. Once the Hague case. Well, hasn't that been settled? No. Parentage? No. I thought it was. No. That's what's on. You cannot do that. That has to do with custody. You cannot do that until you, when, once a Hague case is filed. Well, who's disputing parentage? Not parentage, who's the mother and who's the father. It is to establish custody of the children, and that cannot be done before the jurisdictional issue is decided. That is, where is the, which court has jurisdiction? Well, we should be better off having that custody issue decided in the state court. You cannot have that anywhere. If you decide the Hague case, you can decide. Forget about the Hague case. No, you can decide the jurisdiction. Forget about the Hague case right now. Just as a practical matter, wouldn't you be better off having this issue of custody and visitation decided in the state court in San Diego? The federal, under the Hague. I said forget about the Hague. I can't because the federal and the state. You're not listening to me. And the state. Look, you know, federal judges don't like to get into these domestic relations matters. You know that, don't you? Speak up. Yes. Okay, smile too. But sometimes we have to. Sometimes we have to. But you'd be better off, I think, with the state court. I don't think so. The federal courts really listened to us. They looked at the issues. However, when the judge made this particular ruling that she could not, he would not accept her, he did not really look at the issues. But up until that point, he had been looking at the issues. And this is a trial court. It is the petitioner's choice. So it's going to go back to the same judge who's already said these things are well settled. He might. He's a very judicious man, and he may simply look at it and say, okay. And once he hears the evidence, once he hears the evidence, it's clear. Look, this woman has been prejudiced from the very beginning. When this father, Duarte Bardales, first took this children, this lawyer, Mr. Morde, filed a temporary restraining order even before the children were in the United States and may have signed the proof of service and the documents prior to their even coming to and stating in the documents that they lived in California. She has been prejudiced from the very beginning. Would you take that up with the State Bar? We will at some point. We have to get through this first. Okay. That's on the agenda. All right. Thank you. May it please the Court. Attorney Victor Morde on behalf of Mr. Edgar Bardales, the appellee in this matter. Good morning. This is a long and ugly case. It goes without saying. What? This is a long and ugly case. It goes without saying. It doesn't have to be a long and ugly case. I agree. And it seems to me that you've got some explaining to do. So go ahead. Okay. As a threshold matter, I am bilingual. I speak Spanish. My law office is about 10 miles from the Mexican border. I do have personal experience working with the Mexican consulate in San Diego. I have personal experience working with the Secretary of Foreign Relations in Mexico City. And I have personal experience working with judges in Tijuana. How much experience has he had in the family court in knowing about children and their mothers and fathers? I've been in family law for about eight, nine years now. Pardon me? I've been doing family law for eight or nine years now. The point I wanted to make was that when my client came to my office and indicated that he believed in good faith his children were being subjected to physical and or sexual abuse in Mexico, we had to weigh our options realistically speaking, keeping in mind that expediency was of great importance. He basically had two options, litigate this case in Mexico. Or steal the children. Those were his options. Yes. And this panel will judge him. God will judge him. I don't know. But the bottom line is he did what he thought he had to do. So you admit to kidnapping? Well, kidnapping, he... Now, you admit to kidnapping and under the Hague Convention, aside from estoppel, the mother is entitled to have those children brought back to Mexico where they were stolen. The convention doesn't use the word kidnapping. Correct? No. This is abducting. No, because we were alleging an Article 13 defense, which is a defense to the return, which is that the kids were in grave danger of facing... Yeah, but this is all allegations. There are a lot of allegations and no proof. There's no record. No proof. The problem was that the former trial counsel, not me, didn't do a good job laying foundation for her evidence. The record reflects that opposing counsel filed 15 motions in limine. 13 were granted. My client, in a sense, got lucky because Ms. Duarte failed to show up to trial for the fourth time. She missed three trials in state court. She has a problem with getting to the United States. She doesn't have any money. And your client's got the children, and your client has consistently avoided letting the mother, and that, to me, I can't understand, letting the mother have visitation rights to the children. I can't stomach that, frankly. Ms. Duarte was in the country when she could have appeared for the three trials in state court, which she failed to appear for. And she no-showed, well, she no-showed for the federal case because of the allegation she raised, losing her passport in Mexico City. I have been speaking, I spoke extensively with opposing counsel about child visitation and child custody. Many of her assertions about the law are incorrect. This country is governed by the, well, all the states in this union have adopted the Uniform Child Custody Jurisdiction and Enforcement Act. This is an interstate compact which governs all child-sharing disputes in the nation. Federal district court doesn't have jurisdiction under any circumstances to assume visitation. Why don't we talk about the legal issue which is before us as a result of the notice of appeal and the proceedings which took place in the district court below, rather than these colorful issues about whether mothers are entitled or not entitled to the return of abducted children. Thank you. I would love to. The legal issue, from my perspective, is, first of all, whether or not principles of equitable tolling apply to Article 12 of the Hague Convention. There is only one appellate court decision in the nation which has decided this. It's the case entitled Ferns v. Reeves. For the reasons stated in my brief, Ferns v. Reeves should be disavowed. The analysis is included. What is the relevance of whether tolling applies to the Hague Convention? It's a threshold issue because before you can decide whether or not factually it should be applied, you have to decide whether legally it applies in the first place. Whether the Hague Convention applies at all? Whether equitable tolling applies at all. If it doesn't apply, then the action was commenced outside the regular period, and you're entitled to the well-settled presumption. As a matter of law. And if I lose on the legal matter, then each becomes a factual one reviewed for clear error by this panel whether or not there was sufficient evidence in the record. So it's your position, if I understand it correctly, that since you're entitled to the presumption that these children were well settled because the claim was not filed in time, the judge below was correct in granting a motion for judgment on the pleadings and correct in denying Rule 59E motion. That's my assertion. The only issue on that, though, however, is that the issue of what well-settled means is a mixed issue of law and fact. There is no appellate court case in the country, state, federal, what have you, which addresses what well-settled means. Was there actually a hearing on that? There was not a hearing. A noticed hearing? There was a motion. There was not an in-person evidentiary hearing. There was a 59E motion. It was noticed? Yes, absolutely. And how did Mother get the notice? Mother filed a motion under 59E alleging that she had newly discovered evidence which proved that she could not enter the country because her passport and visa was stolen in Mexico. But what she did not do, unfortunately, opposing counsel probably did not know, that it's insufficient to simply provide evidence that she couldn't appear in court because you have to address the third prong in the coastal transfer case out of the Ninth Circuit, which indicates that you have to show why the outcome of the case would have been different had the case been reopened. And she provided no evidence. The record is bereft. I read you a little bit what the court said. And so if we see that proof that Duarte had her purse stolen in Mexico on the 15th, then I'll put the matter back on the calendar for a status, and we'll address any depositions or anything else you want to address. And the way I read the record is that the judge determined, well, her purse was stolen, but that doesn't make any difference because of the well-settled rule. And your position is, really, as I understand it, is that it's immaterial that there is not such a thing as equitable tolling. That's your position on the cases that hold for equitable tolling are wrong. Yes, they're all wrong. Is there a Ninth Circuit case on equitable tolling? No, there's not. And let me explain why it's wrong, because it's easy to say it's wrong, because I don't like decisions. It's another thing to justify. I don't like coming to court and losing. So let me tell you why I think I'm right. None of the cases you have to see. For me to get this, you have to speak up a little bit. You've got to look at me a little bit. Let me give you a two-minute review of the law on this, the history, because I think it's very instructive. If you would indulge me, and then I can explain why it's incomplete. In dicta, the Eleventh Circuit analogized Article 12 to a statute of limitations. It stated, quote, unquote, that to conceive of a time period arising by a federal statute that is so wouldn'tly applied that it is not subject to some tolling, interruption, or suspension, if it is shown or demonstrated clearly enough that the action of an alleged wrongdoer concealed the existence of the very fact which initiates the running of the important time period. So there was no analysis under the convention or the explanatory report, which is the primary source of interpretation for the convention. Next case. Boquete v. Owsit was decided in the Southern District of Florida. It's a district court decision. It cites Loppes v. Loppes. I find the analysis in Loppes persuasive. So it found the dicta, which didn't analyze the report, or the convention persuasive. Next case. Lynch v. Lynch. The Middle District of Florida cited the dicta in Loppes. In addition, it cited an Eleventh Circuit case called Ellis v. General Motors Acceptance Corp. It stated that unless Congress states otherwise, equitable tolling should be read into every federal statute of limitations. Again, no analysis under the convention of the report. Then comes Anderson v. Acree, the only district court which actually agrees. Kennedy, counsel, didn't the judge in the Southern District of California, San Diego, make a finding that none of the affidavits or declarations that the mother had filed showed that she didn't know where the children were or that the husband or the father was hiding the children because the children were living at the house that they always lived at? Isn't that what he said? Isn't that what he found? He said that Amelia makes arguments that she couldn't find Hector, but that's not relevant to an analysis under equitable tolling, because the issue according to the Eleventh Circuit is not what Amelia did. It's what Hector did. So it doesn't matter that Amelia couldn't find him. What matters is that Hector made himself unfindable. That's what equitable tolling always is. It's used against a person who, by his actions, makes the person who's claiming equitable tolling change his position. Yes. And that's a factual issue. So the judge in this case found that the father, Mr. Bardalis, did not do anything to impede the mother from finding out the location of the children. Isn't that so? That's correct. And that's a factual issue entirely reviewed for clear error. The trial court has given tremendous deferential treatment. Did you review the file, though? What resources did the mother have? See, I probably got the wrong impression here. It seemed to me that this battle was going between people who were well off, because there's a lot of money going back and forth. I'm not as expensive as I should be, but Hector has spent a lot of money on this case. He believes his children are not well off in mother's primary care, and not in Mexico. Well, that may be, but what resources does the mother have? She's in a very, very difficult position. So how is she supposed to get the money to make the phone calls? Hector believed the children were being subjected to physical and sexual abuse. We put it in our declaration in the temporary restraining order. I fully expected the DA's office to prosecute this case within 12 months, and I fully expected to have to defend Hector's actions based upon an Article 13 defense, in other words, proving that the kids were, in fact, subjected to harm in Mexico. I never thought for a second that I would be before the Ninth Circuit 40 years hence. Let me ask you a question. These domestic cases are about as tough and difficult as anything in the law. You know, the emotions run high, and you look like a very practical, able guy, and so does your co-counsel. This really, this is off the record and so forth, but it ought to be settled in some way. I have been telling opposing counsel to bring an action in state court. They are efficient. Well, yeah, but I'm not talking about more actions. I'm talking about some kind of, because somewhere down the line, believe me, the children are going to have both parents somehow and should have. And it seems to me that effort should be brought somewhere to try to resolve this even while we're considering it. All I can say is I don't want to concede anything on the record. A parent's primary responsibility is co-parenting. Not all parents believe that or understand that concept, and I'm just a lawyer. But there are very efficient, cheap, economical, expedient remedies in state court, but opposing counsel will not use them. She is not helping her client by asking this court to grant a motion for limited remand so the district court can grant an order for visitation. That's not helping her client. Well, why can't you just sit down and mediate this? Opposing counsel wants to do it in federal court. There's no jurisdiction under the UCCJEA to do that or under the convention. We have an appellate commissioner who does mediation. Perhaps you didn't know that.  Yeah. What? She refuses to do it. Do you want us to refer this to mediation? She refuses to do it. Ultimately, this case will be, her child training rights will be adjudicated in the state court one way or another. That isn't the question we asked you, though. What would you think, and you're not bound by this, would you think that if this case went to our mediator, it could do some good? I do not think so. Well, that's why. And I'm sorry. Why? Because your client's stubborn? My client is... Stubborn. Co-parenting is an important role of being a good parent, and he doesn't... Yeah, but these girls are going to grow up, and these kids are going to grow up, and they're going to wonder about how their father treated their mother. I know. You know that? I know that. And he's going to pay the price for it someday. And the mother took the children to Mexico prior. I know. It's an ugly case. It really is. Yeah, so maybe it ought to be straightened out now. I... And maybe there ought to be a way where you can sit down with a mediator that knows how to handle these matters and work this thing out. The parties were in mediation in state court. There was a child... The action in California court wasn't just paternity. It was child custody and child visitation. According to opposing parties' own brief, it's not in the record, but it's on page 11 of her brief, and on page 7 of my brief, the parties attended mediation, and the court ordered child custody and visitation orders already. She could... The reason why... You're talking too fast for me. Sorry. What did you say? The state court granted orders regarding child custody and child visitation. They only gave... They gave father exclusive custody and visitation because mother failed to show up the third time, and there was a default hearing. Well, she doesn't have any money, this poor woman, you know. Well... Her purse is stolen. The fourth time. Sure. The third time. You know, whatever it is. Well, I mean, the mediation is free. They already went to mediation. She was awarded some child sharing. They recommended psychotherapy. This could be the order, and whether or not Hector is the best parent in the world, there are easy, cheap remedies to force him to comply with state orders. Well, forget about the state right now. I'm sorry. You're in federal court. Okay. And... I cited in... You... I cited in my brief... Wait, wait. I'm sorry. Baker Kelly. You're Baker Kelly. I am. All right. You're from Oakland. I am. I've come down here for every single trial. Do you want to have this matter heard by our court mediators? Absolutely. I've asked every counsel, and I've asked every time I had the opportunity. All right. Now, you have a problem with that? We need a tribunal which has jurisdiction over these cases. Do you have a problem with that? I do not think it would be... I don't care what you think. Do you have a problem with that? We can postpone this case more. I just don't think it's going to be fruitful, unfortunately. And not because I have a problem. He has a problem. You have a problem, and I'm glad to learn that, because I'm learning a lot about your client by looking at you. Okay? Okay. I cited the... You've got two minutes and 34 seconds more to visit with me. Thank you. I cited the explanatory report on the Hague Convention. The citation on pages 22 through 24 of my brief clearly indicate that the drafters of the convention already took into consideration the possibility that parents might not be able to find their parents in the countries to which they've been abducted. They've already made what they call an arbitrary, perhaps arbitrary, time limit, and so they've already weighed the factors which go into an equitable tolling argument. They've decided that one year is the limit. And by equitably tolling Article 12, you are violating the principles upon which the drafters established the one-year time limit. And none of the cases at all have addressed that issue, and the Eleventh Circuit doesn't address that issue either. So if the Eleventh Circuit doesn't address the primary source of interpretation, which is the explanatory report on the Hague Convention, it is a fatal mistake. Second of all, Article 12 is not a statute of limitations because it allows people to file an action even after one year has passed. It simply changes the defenses. So it cannot be analyzed to a statute of limitations or limitations period. And lastly, and very importantly, Article 18 of the convention states, very briefly, the provisions of this chapter do not limit the power of the judicial or administrative authority to order the return of the child at any time. So even after a court has found that children are well settled, even after they've found that a child could be faced with sexual abuse in the country of origin, and even after a court has found, pursuant to Article 20, that sending children back to the country of origin would violate fundamental principles of human rights, the court can still send them back. So these equitable arguments are properly made within the context of an Article 18 analysis, not Article 12. So I'm giving you a way out. I'm saying that if an opinion is released, you could say, yeah, but you can still make these arguments under Article 18. Even after a year. And to the federal district judge in San Diego? I mean, he doesn't have any jurisdiction over family matters. No, I'm talking about Article 18 of the convention. So what you're saying is that we could reverse and remand and say, consider this case under Article 18? Well, no, because that issue wasn't raised on appeal and it wasn't raised in the lower court. Then why are we discussing it? Because I want you to recognize that there are ways that people in her position can make legal arguments even when you find that the one-year limitation is passed under Article 18. We have enough work without involving new things that aren't important. Okay. I'm just trying to be helpful. I'm just trying to provide insight. I apologize. If this panel would like to send this to mediation, I have no opposition. I just, I just. What did you say? If this panel would like this case to go to mediation, I have no opposition per se. I just believe that I've made good faith attempts to resolve it beforehand and it hasn't worked. So that's why I don't think it would work now, but I have no opposition to try it again. Thank you. Now, let me understand your position. I understood your position to say I don't want to meet with any mediator. Now what I hear you saying is I'm willing to try again. Am I misreading you? Well, see. No, wait a minute. I'm just, I'm not talking about the state. I'm a federal judge, and we have a mediator in the Ninth Circuit. I'm not a judge in the Ninth Circuit, but I understand it because we have one in the Eighth Circuit. And I want to read you. Do you want this, are you willing to have a mediator meet with you, your client, meet with the opposing counsel, and maybe even her client, if she can get her in and see if this thing can be resolved amicably? In Pasadena? No, wherever. Maybe the mediator will go to San Diego. You know, so our mediator, my mediator in the Eighth Circuit travels. I assume they travel. We send them all over. Did they have MFCCs, who are mediators in state court, and they're free? Well, I'm not talking. I don't charge anything. I'm not talking about. This is free, too. Yes or no? I want this. I don't want to abuse your resources. Don't worry about that. All right. Don't worry about that. All right. We've already taken enough abuse. I just. If you want a mediator, if you want to go mediate in good faith, we'll even give you a free cup of Starbucks coffee. I just. I don't give the wrong impression. It's just I don't think it's going to work. That's the problem. Well, you know, that's a wonderful attitude. Are you married? Yes, I am. Two kids. Two kids? Yeah. So I hope I don't get abducted. All right. How long have you been married? I've been married since 98. So it's been nine years, two kids. Well, I've been married more than 60 years, and I'm just trying to give you a little advice, you know. Don't be so rigid, you know. Learn to say yes. Okay, we'll try it. You must be obeyed. Man. So you think about it. You let me know. Okay. If in good faith you'll go down, we'll send a mediator there, and we'll see if we can work out. I think the mother needs to be there. The father needs to be there. The children need to be there. The children need to be there. And the mother. And it will be in the courthouse in San Diego. We've got a lot of rooms over there. And just see what you can do, that's all. You've got to look at the future, too. How old are these kids now? The two oldest ones now I think are 16 and 15 or 14. And the other two, I think eight or nine or nine or ten. Well, they're growing up fast. I know. They're growing up fast. Yeah. Okay. Thank you. We better take another short break. Yeah, we will. Yeah. Your Honor, first of all, the alleged abuse took place in 2000. The children were stolen in 2003. Let's talk about mediation. Mediation I am totally in favor of. My client has a visa and can come back here any time. All right. And you're over your time, too. I reserve five minutes, I thought. No, you're still over your time. Okay. Six minutes overtime. All right. And counting. All right. Well, all I'm saying is I'm perfectly willing to do anything to settle this case, to make it so that the mother is allowed to see her children and they can share. We'll send a ‑‑ if we get a mediator to go down there, you'll fly down there, right? I have flown down there every time on my dime. It's nice down there. And I have done the entire case on my dime. We know that. Yeah, we know that. We know that. And let me ‑‑ But I'm interested in justice. And I'm interested in the development of this law. That's why I would like your case published. Yeah, I know. We know all that. Let me just hold on for a minute. So, Mr. Morley? Morley. Chula Vista? Morley. Huh? Yes. Is that my pronouncing that right? Morday. Morday. Yes. Okay. You want to try that in good faith? Sure. If I may. You don't have any fingers crossed, do you? No, no. Your Honor, you haven't seen all this case. They have gone to mediation today. She has four of them. But we're in federal court, and this is where we should do it. Well. This is where the forum ‑‑ they've taken jurisdiction of this case. This is where we should do this. To do what? Mediation. Okay. Well, when you say this, I don't know what you mean. Give me a lot of things. Mediation. All right. Mediation. M-E-D-I-A-T-I-O-N. It spells happiness. I hope so. Because every time she calls me, she says, can I see my children again? We'll issue the appropriate order. Thank you. All right. Thank you. In the meantime, the matter is submitted. And we're going to take a break, and we'll be back. All rise for family recess.
judges: Bright (8th Cir.), Pregerson, Bea, Cjj